## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jun 11 2018, 5:21 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Ruth Johnson
Megan Shipley
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Matthew B. MacKenzie
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Rodolfo Ruiz Lugo,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

June 11, 2018

Court of Appeals Case No.
49A02-1711-CR-2548

Appeal from the
Marion Superior Court

The Honorable
Peggy R. Hart, Judge Pro Tempore

Trial Court Cause No.
49G05-1702-F5-5570

**Kirsch, Judge.**

[1] Following a bench trial, Rodolfo Ruiz Lugo ("Lugo)" was convicted of Level 5 felony sexual misconduct with a minor.[1] He now appeals, arguing that statements made by the State during closing argument, to which Lugo did not object, constituted prosecutorial misconduct and that the misconduct resulted in fundamental error.

[2] We affirm.

## Facts and Procedural History

[3] In September 2016, E.H. was fourteen years old, and Lugo was her brother-in-law, as he was married to E.H.'s older sister, Yajayra.[2] E.H. lived in a residence with her mother ("Mother"), and at least two older sisters, as well as other family members. Lugo and Yajayra and their three young children had a separate residence, but because Yajayra was in prison at times relevant to this case, Lugo's three children mostly stayed at Mother's home during the week and with Lugo on the weekends. It was "common" for E.H. to spend time at Lugo's house, babysitting and helping with the children.[3] *Tr. Vol. II* at 44. She also helped Lugo by going with him to the children's doctor and appointments. E.H. has known Lugo since she was seven years old. *Id*. at 8.

---

[1] *See* Ind. Code § 35-42-4-9(b)(1).

[2] The parties spell the name as Yajayra, but the Transcript also sometimes spells it Jajayra. *Tr. Vol. II* at 8-9.

[3] E.H., who was in eighth grade, was at home during the day because she took online classes for her schooling.

[4] On the morning of September 20, 2016, E.H. was babysitting two of Lugo's children at Mother's house. Around noon, Lugo came and picked up his children, along with E.H., and they went to his house to eat lunch. While E.H. was cleaning up after the children, something spilled on her shirt, and she asked Lugo if she could borrow a shirt from him. He agreed and told her to get a shirt out of his bedroom closet. E.H. went into the bedroom and took off her shirt; she was not wearing a bra. She was about to grab his shirt when she heard someone come in behind her, and she turned around and saw Lugo as he locked the door behind him. E.H. "froze," and Lugo came up to her and touched both her breasts with his hands, telling E.H. that her breasts "were big for [her] age." *Id.* at 15-16. He put his mouth on her right areola and said, "[D]on't worry, I'm not going to bite." *Id.* at 17. He asked E.H. if he could touch her "butt," and, at that point, E.H. "unfroze," grabbed her shirt, and ran out of the room. *Id.* at 17-18. A few minutes later, E.H. told Lugo to take her home, which he did, and on the way, he told E.H. not to tell anyone what happened.

[5] When E.H. got home, she did not tell anyone about the incident with Lugo, but her older sister Yaquelin noticed that E.H. was crying that night. *Id.* at 39. The next day, E.H. was crying and throwing up in the bathroom because she "felt disgusted with [her]self." *Id.* at 21. Yaquelin noticed and asked E.H. about it, and while E.H. initially told Yaquelin that she was "fine," she later told Yaquelin "what happened." *Id.* at 21-22. One or both of them called Mother, who came home from work, and another older sister was also called and came

home. One of the women called the police. Indianapolis Metropolitan Police Department ("IMPD") Officer Katrina McEvilly ("Officer McEvilly") responded and came to the house. After speaking to E.H., Officer McEvilly contacted the IMPD sex crimes unit, and, in response, Detective James Carver ("Detective Carver") came to the scene. Detective Carver spoke with E.H., and E.H. later participated in a forensic interview at the Children's Advocacy Center. Detective Carver conducted a follow-up interview after the forensic interview.

[6] On February 10, 2017, the State charged Lugo with one count of sexual misconduct with a minor as a Level 5 felony. The matter proceeded to a bench trial in September 2017. At trial, E.H. testified about what happened with Lugo and how she told others about it. She said that, the following day, Yaquelin asked her questions about what was wrong, and E.H. described the exchange as follows:

> Q: And how did you tell [Yaquelin] what happened?
>
> A: She asked me if someone had hurt me, I shook my head no, she asked me if my brother-in-law Justin had hurt me, I said no. She asked me if her boyfriend, or fiancé during the time, she asked me if he had hurt me, I said no. Then she asked me if Rodolfo had hurt me and I didn't say anything.
>
> Q: What did you do?
>
> A: I didn't say anything and she took that that he was the one that did something.

> Q: Were you crying?
>
> A: Yes.

*Id.* at 21-22. Yaquelin telephoned Mother, who came home. E.H. stated that Yaquelin told Mother, who began crying. E.H. described, "My mom was crying and said it was okay, it was not my fault." *Id.* at 23.

[7] Yaquelin testified that, on the night of September 20, she saw E.H. was crying, but did not inquire about it. The next day, Yaquelin saw E.H. crying and throwing up in the bathroom. Yaquelin checked on E.H. and asked why she was crying. Yaquelin's testimony was as follows:

> Q: And did you ask [E.H.] why she was crying?
>
> A: Yes.
>
> Q: Without telling me what she said, did she tell you why she was crying?
>
> A: Yes.
>
> Q: Did it take any prompting or did she tell you right away?
>
> A: It took me asking her a bit.
>
> Q: And what did you ask her?
>
> A: I asked her if anyone had touched her.

Q: And did she respond right away?

A: No.

Q: Did you just continue asking her questions?

A: Yes. I asked her if my boyfriend had touched her or if my other brother-in-law had touched her and then I asked her if Rodolfo had touched her.

Q: Did she eventually tell you who touched her?

A: Yes.

*Tr. Vol. II* at 40. Yaquelin said that when she asked E.H. if Lugo had touched her, E.H. began crying harder and "said yes." *Id*. at 45. Yaquelin told E.H. that "everything was going to be all right" and assured E.H. that she "would handle it." *Id*. at 40. Yaquelin testified that, when Mother arrived home, she sat Mother down and told her, and Yaquelin stated that she also told her other sister, Yesenia. Yaquelin said that after Yesenia got there, together they decided to call the police. Yaquelin was asked, "Did you tell [the officer] what happened?" and Yaquelin said "Yes." *Id*. at 42.

[8] Mother described that Yaquelin called her at work and said there was "a problem," so she went home. *Id*. at 60. After speaking to her daughters, together they called the police. Mother testified as follows about speaking with E.H. about the incident:

Q: [] On September 21st of 2016, did you learn that something had happened to E.H.?

A: Yes.

Q: And did you have a chance to talk to her about it after you found out?

A: Yes.

Q: What was E.H., what did she look like, what was she acting like when you talked to her about it?

A: She wasn't speaking very well because she was crying and she could not speak anything because she was crying.

*Id.* at 58. After the incident with Lugo, Mother testified to taking E.H. to a psychiatrist.

[9]   Officer McEvilly testified that she spoke to E.H. at the home, and her demeanor was very timid and shy. About speaking to E.H., Officer McEvilly said, "I asked her if she wanted to tell me what happened[,] and her and I stepped aside and she told me what happened." *Id.* at 50. At that time, E.H.'s eyes were watery, and she "kept looking down" and "was very uncomfortable." *Id.* at 51.

[10]  Detective Carver testified that he responded to the call around 11:00 p.m. and went to the home, where he met with E.H. His testimony about that meeting was:

Q: And did you have a chance to take a brief statement from her about what had happened to her that brought you there?

A: Yes.

Q: And did she tell you about an incident with her brother-in-law?

A: Yes.

*Id.* at 67-68. Detective Carver said that E.H. was uncomfortable and was crying. Because of E.H.'s age, Detective Carver arranged for a forensic interview to be conducted at the Children's Advocacy Center. After that interview, Detective Carver had a follow-up interview with E.H., making it a total of three interviews that he had with her. On cross-examination, Detective Carver was asked, "When you were speaking with E.H. and she was telling you about the incident, did she say the word nipple or areola?" and the detective replied, "[n]ipple" and noted that he put that in his report. *Id.* at 72.

[11] During closing argument, the State commented on E.H.'s testimony several times, including:

> [S]he has given statements and given testimony about this once to the detective, once in a forensic interview, a follow-up interview with the detective, a deposition, here today, and she had to tell her sister and her family first. That's six different times that she has told that story and the only inconsistencies are she doesn't remember now how her shirt got dirty? . . . So she is entirely consistent about the facts and the details of what

happened to her. Every single time she has talked about it she has told people exactly what happened to her[.]

. . . .

[S]he has been entirely consistent in telling what happened to her over and over and over again, her testimony is believable and that means if her testimony is believable the court can find the defendant guilty beyond a reasonable doubt and that is what we'd ask the court to do. We are asking this court to believe EH when she told you what happened to her, as she has done time and time again without inconsistency.

*Id*. at 75-76, 78. Lugo did not object to any portion of the State's argument. In Lugo's closing argument, his counsel argued that E.H.'s story was not entirely consistent with that of her mother and sisters and that her version of events was not credible, noting she could not remember some details. The trial court found Lugo guilty as charged, and he now appeals.

# Discussion and Decision

[12] Lugo asserts that the State committed prosecutorial misconduct in closing argument based on the prosecutor's comments about E.H. being "entirely consistent" as she told the story "over and over" to various people "six different times." *Id*. In reviewing a claim of prosecutorial misconduct, this Court determines (1) whether misconduct occurred, and if so, (2) whether the misconduct, under all of the circumstances, placed the defendant in a position of grave peril to which he or she otherwise would not have been subjected. *Ryan v. State*, 9 N.E.3d 663, 667 (Ind. 2014); *Tibbs v. State*, 996 N.E.2d 1288,

1290 (Ind. Ct. App. 2013), *trans. denied*. "A prosecutor has the duty to present a persuasive final argument, and thus placing a defendant in grave peril, by itself, is not misconduct." *Ryan*, 9 N.E.3d at 667. Whether a prosecutor's argument constitutes misconduct is measured by reference to case law and the Rules of Professional Conduct. *Id.* Our Supreme Court has explained that "[t]he gravity of peril is measured by the probable persuasive effect of the misconduct" on the factfinder. *Id.* (quoting *Cooper v. State*, 854 N.E.2d 831, 835 (Ind. 2006)).

[13] Lugo did not object to the prosecutor's statements that he now argues were prosecutorial misconduct. "A claim of prosecutorial misconduct presented on appeal without a contemporaneous trial objection will not succeed unless the defendant establishes not only prosecutorial misconduct but also the additional grounds for fundamental error." *Tibbs*, 996 N.E.2d at 1290. Our Indiana Supreme Court has emphasized the "extremely narrow" application of the fundamental error doctrine:

> To qualify as fundamental error, an error must be so prejudicial to the rights of the defendant as to make a fair trial impossible. To be fundamental error, the error must constitute a blatant violation of basic principles, the harm or potential for harm must be substantial, and the resulting error must deny the defendant fundamental due process.

*Id.* (quoting *Benson v. State*, 762 N.E.2d 748, 755 (Ind. 2002)) (citations and quotations omitted). Additionally, Lugo's case was tried to the bench, and "generally valid issues with regard to fundamental error such as 'unfair

prejudice, confusion of the issues, or potential to mislead the jury' are relevant only in jury trials." *Id*.

[14] Lugo contends on appeal that the State committed prosecutorial misconduct because the prosecutor "repeatedly relied on information that was not admitted at trial." *Appellant's Br*. at 3. Specifically, Lugo's argument is that, in closing argument, the prosecutor stated that E.H. had been entirely consistent each of the six times that she had discussed the incident with family members and police officers, but that, at trial, the State did not present evidence of the content of those prior statements, and, therefore, "[t]he State's improper reliance on information that was not admitted at trial was prosecutorial misconduct." *Id*. at 7. Lugo acknowledges that he did not object during the State's closing argument and therefore must establish fundamental error.

[15] Here, the record reflects that E.H. provided specific testimony as to what Lugo did to her: He followed her into the bedroom as she changed her shirt, he locked the door behind him, he used both hands to touch her breasts, and he put his mouth on one breast. She also testified to the fact that she shared what had happened with her sisters, Mother, and law enforcement. Thereafter, the witnesses testified in various ways to the fact that each had been told "what happened." *Tr. Vol. II* at 21-22, 50, 58, 67-68. None of the witnesses testified to the exact content of what E.H. had said. However, Yaquelin testified that, when she asked E.H. if Lugo "had touched her," E.H. began crying harder and said "yes." *Id*. at 40, 45. Detective Carver testified that E.H. used the word "nipple" in the course of telling him what had occurred. *Id*. at 72.

Furthermore, each witness described what he or she did after learning the information. For instance, Yaquelin told E.H. that "everything was going to be all right" and that Yaquelin would "handle it," the sisters and Mother called the police, and Mother assured E.H. that it was "not [her] fault." *Id.* at 23, 40. After Officer McEvilly was told what happened by E.H., she asked for a sex crimes unit detective, and Detective Carver came to the scene and spoke to E.H. After talking to E.H., Detective Carver directed that a forensic interview at the Children's Advocacy Center be conducted. Thus, even though we do not know if E.H. was consistent in terms of the description and detail that she conveyed about Lugo's acts, we find that the evidence presented indicates that E.H.'s statements to family and law enforcement were consistent, at a minimum, in terms of the fact that Lugo had touched her inappropriately, including a touching of her breast. Given this record, we do not find that the prosecutor's comments during closing arguments constituted prosecutorial misconduct.

[16] Furthermore, even if, as Lugo claims, the State committed prosecutorial misconduct, Lugo has failed to establish that the comments placed him "in a position of grave peril to which [he] would not have been subjected otherwise," nor did the comments rise to the level of fundamental error, which applies "only when the error constitutes a blatant violation of basic principles, the harm or potential for harm is substantial, and the resulting error denies the defendant fundamental due process." *Ryan*, 9 N.E.3d at 667; *Wilson v. State*, 931 N.E.2d 914, 919 (Ind. Ct. App. 2010), *trans. denied*. E.H. testified and described what

Lugo had done, and Yaquelin testified that E.H. confirmed that Lugo had touched her. Officer McEvilly and Detective Carver also testified that, based on what E.H. told each of them, Lugo was identified as the person who had committed the acts in question, and Detective Carver stated that E.H. used the word "nipple" in describing to him what had occurred, which reflects that E.H. told him about Lugo's touching, in some manner, of her breast. *Tr. Vol. II* at 72. As noted by the State on appeal, E.H.'s testimony was internally consistent and not contradicted by other witnesses or evidence. *Appellee's Br.* at 9-10. The prosecutor's comments stating that E.H. was "entirely consistent" when she told the story "six different times" did not make a fair trial impossible or violate basic principles of due process. *Tr. Vol. II* at 75-76, 78.

[17] Affirmed.

Baker, J., and Bradford, J., concur.